MARY ELLEN HAIGHT *vs.* ELIHU T. HAMOR.

Hancock.    Opinion May 23, 1891.

*Deed.   Monument.   Watercourse.   Evidence.*

The general presumption respecting the extension of a riparian grant to the centre of a non-navigable stream does not apply, when there is a clear intention in the deed to make the side of the brook, and not the centre of its channel, the monument.

Where the language of a deed, in such case, shows a manifest intention to stop at the water's edge, it will prevail over the general rule in the construction of deeds that when a grant of land is bounded on such a water course, above the ebb and flow of the tide, the stream is to be regarded as a monument equally upon the land granted and the land adjoining, and that the boundary line will be in the centre of such monument.

In a deed, defining the boundary line between two coterminous riparian owners, it appeared that the brook was of sufficient capacity for saw-mills; that in the description of the boundary lines, two saw-mills were located upon it, and three mill privileges mentioned in connection with it; that the brook itself was not made a boundary line between the parties, the line crossing the brook three times, dividing it into four sections and leaving to each party the whole stream and land on both sides of it in his respective section; and that the first call in the deed expressly gave four rods of land on the southern side of the brook, the other calls showing a strong probability that the several strips of land were intended to be of uniform width, essential to the convenient and profitable enjoyment of the mill privileges; *Held*; that the brook is made the *terminus a quo*, and not the *terminus ad quem*; *Also*, that the four rods should be measured from the side and not from the centre of the stream.

In a deed of real estate a line is thus described: "Following down the brook four hundred and fifty-six feet, with four rods of land on the southern side of the brook; thence crossing the brook at right angles northerly and down the stream within four rods of the brook one thousand three hundred and sixty-eight feet; thence crossing the stream at right angles southerly, and following down the stream within four rods of the brook one thousand three hundred and sixty-eight feet; thence crossing the stream at right angles northerly and following the stream within four rods of it seventy-six feet below the spiling of the old mill-dam." *Held*; that the northerly line of the two four-rod strips of land lying on the northerly side of the brook is four rods from the side of the brook, above the ebb and flow of the tide, and not from the centre of the channel.

A written agreement between the grantor and a third party, made two years before in contemplation of a conveyance of the same lot of land, is not admissible to explain any supposed ambiguity in this description of the line.

ON REPORT.

This was a real action. Plea, general issue, and a disclaimer of all the *locus* except so much as is covered by the strips described in the defendant's deeds, measuring them according to the defendant's contention.

The question for the determination of the court was as to the construction of deeds, which sufficiently appear in the opinion. The plaintiff claimed that the four rods mentioned in the deeds should be measured from the thread of the stream or centre of the channel.

The defendant claimed that the measurement should be from the side of the stream, above the ebb and flow of the tide, and from high water mark where the tide ebbs and flows.

It was admitted that the tide flows into the stream, for a portion of its length, opposite the land of the defendant; and at low water the tide ebbs entirely out of the stream.

The other facts of the case appear in the opinion.

*Hale and Hamlin, Deasy and Higgins,* with them, for plaintiff.

Counsel cited: 2 Devlin on Deeds, § 1024, and cases there cited; *Lunt* v. *Holland,* 14 Mass. 149; Ang. Wat. (7th Ed.) § 23, *et seq.* citing *ex parte, Jennings,* 6 Cow. 518; *Harlow* v. *Fisk,* 12 Cush. 306; Gould on Waters, § 196; *Herring* v. *Fisher,* 1 Sandf. 344; *Bennett* v. *Plotter,* 6 Ohio, 504, 508; 3 Kent Com. 433-4; *Boston* v. *Richardson,* 13 Allen, 154; *Gove* v. *White,* 20 Wis. 425; *Hicks* v. *Coleman,* 25 Cal. 122; *Jackson* v. *Louw,* 12 Johns. 252; *Rowe* v. *Bridge Corp.* 21 Pick. 344: *The Daniel Ball,* 10 Wall. 557; *The Montello,* 20 Wall. 430; *Newhall* v. *Ireson,* 8 Cush. 595; *Paul* v. *Carver,* 26 Pa. St. 223.

The real intent of the conveyances was to divide the stream, split it in the centre or thread, the land being a secondary consideration.

Boundary: *Lowell* v. *Robinson,* 16 Maine, 357; *Adams* v. *R. R.* 11 Barb. 452; *Seneca Nation* v. *Knight,* 23 N. Y. 500; *Lincoln* v. *Wilder,* 29 Maine, 169; *Robinson* v. *White,* 42 Maine, 209; *Nickerson* v. *Crawford,* 16 Maine, 245; *Pike* v. *Munroe,* 36 Maine, 309; *Winslow* v. *Patten,* 34 Maine, 26; River or brook navigable: *Brown* v. *Chadbourne,* 31 Maine,

22; Ang. Tide Waters, 89; *Rowe* v. *Bridge Corp.* 21 Pick. 344; *Parsons* v. *Clark*, 76 Maine, 478; Gould on Waters, § 43; *Com.* v. *Charlestown*, 1 Pick. 185; *Charlestown* v. *Co. Com.* 3 Met. 202; *Atty. Genl.* v. *Woods*, 108 Mass. 436; *U. S.* v. *New Bedford Bridge*, 1 Wood. and M. 401, 487; *Weathersfield* v. *Humphrey*, 20 Conn. 218; *Burrows* v. *Gallup*, 32 Conn. 501; *Glover* v. *Powell*, 10 N. J. Eq. 211; *Flanagan* v. *Phila.* 42 Pa. St. 219; *People* v. *Platt*, 17 Johns. 211: *Benson* v. *Morrow*, 61 Mo. 345; *Wis. River Co.* v. *Lyons*, 30 Wis. 61; *Braxon* v. *Bressler*, 64 Ill. 488; *Barney* v. *Keokuk*, 94 U. S. 324; *Sparhawk* v. *Bullard*, 1 Met. pp. 107-8.

   *Wiswell, King and Peters*, for defendant.

   WHITEHOUSE, J.   Writ of entry to recover two parcels or strips of land situated on the northerly side of Duck Brook, in the town of Eden.   Both parties seek to derive title from John A. Hotchkiss, who was at one time owner of the land on both sides of Duck Brook;—the plaintiff by a series of conveyances commencing with a deed from John A. Hotchkiss to Richard Higgins, dated September 19, 1838;—and the defendant by a deed from Addie R. Hawley, the sole heir of John A. Hotchkiss, dated September 16, 1882.   The contention between the two involves a construction of these two deeds.

   By the former deed, given in 1838, John A. Hotchkiss conveyed to Richard Higgins one hundred acres of land, more or less, situated principally on the northerly side of Duck Brook. In this deed the description of the line "on the southeast by Duck Brook" is as follows :   "Beginning at the southern corner of the lot and runs northerly to the saw mill on said brook including three fourths of the upper saw-mill privilege and the whole saw-mill thereon; thence from the lower southerly millpost following down the brook four hundred and fifty-six feet with four rods of land on the southern side of the brook; thence crossing the brook at right angles northerly and down the stream within four rods of the brook, thirteen hundred and sixty-eight feet; thence crossing the stream at right angles southerly and

following down the stream within four rods of the brook, thirteen hundred and sixty-eight feet; thence crossing the stream at right angles northerly and following the stream within four rods of it, seventy-six feet below the spiling of the old saw-mill dam; thence at right angles to the brook and following the same to its mouth." It will be seen that by the line thus established with reference to Duck Brook, Higgins gave to the grantee two strips of land on the south side of the brook, and retained in himself two similar strips on the north side, as illustrated by the lines of the accompanying plan.

John A. Hotchkiss made no further conveyances of any part of this property during his life-time, and at the time of his decease had title to these four-rod strips on the north side of the brook, the first being thirteen hundred and sixty-eight feet in length, and the second beginning at a point thirteen hundred and sixty-eight feet below the first and originally extending to a point "seventy-six feet below the spiling of the old saw-mill dam."

The plaintiff claims that the four rods mentioned in the deeds are to be measured from the thread of the stream, and the defendant claims that the measurement should be from the side of the stream, above the ebb and flow of the tide, and from high water mark where the tide ebbs and flows.

According to the terms of the report, the only question presented for the determination of the court is whether the

northerly line of these four-rod strips is four rods. from the centre of the channel, or four rods from the side of the brook.

It is not in controversy that Duck Brook is a small unnavigable stream; and it appears from an admission, in the report, that the tide flows into it for a portion of its length opposite the land of the defendant, and at low water ebbs entirely out of it.

There is a well-known, general rule in the construction of deeds that, when a grant of land is bounded on such a watercourse, above the ebb and flow of the tide, the stream is to be regarded as a monument located equally upon the land granted and the land adjoining, and the boundary line will be in the centre of such monument. In such case the land of the owner on each side of the stream is presumed to extend *ad medium filum aquae,* unless the language of the deed shows a manifest intention to stop at the water's edge. It is of course competent for the grantor to limit his grant as he will; he may include or exclude the entire width of the "monument," by employing terms apt for that purpose.

In the interpretation of conveyances of land as of other written instruments the intention of the party is the real object sought. If the meaning is not clear, resort is had to rules of construction. *Bradford* v. *Cressey,* 45 Maine, 9 ; *Erskine* v. *Moulton,* 66 Maine, 276 ; Ang. Wat. § 23, and authorities cited. But there is no better principle in regard to all rules of construction wherever applied than to use them as assistants toward reaching the intention of the party, and to abandon them whenever it is apparent that they lead one side of that object. *Small* v. *Allen,* 8 T. R. 497. "It is difficult to say that there is more than one rule of construction that has not its exceptions ; and that is, taking the whole instrument together, what does it mean ?" *Ide* v. *Pearce,* 9 Gray, 350. If the intention is still doubtful, the deed may be examined in the light of the circumstances attending its execution, such as the actual condition, situation and occupation of the property granted. *Salisbury* v. *Andrews,* 19 Pick. 250. It may also be interpreted with reference to the reason, or motive, upon which the grantor proceeded in giving the description in question, and from the end in view or the purpose

which was designed.  2 Devlin on Deeds, § 838.  But the intent when apparent and not repugnant to any rule of law will control technical terms, for the intent and not the words is the essence of every agreement.  In the exposition of deeds the construction must be upon the view and comparison of the whole instrument.  Kent, C. J., in *Jackson* v. *Myer*, 3 Johns. 383.

In the case at bar, it is suggested by the defendant that, if the language of the deed can be said to be applicable either to the measurement from the centre line or from the side line of the brook, then evidence *aliunde* is admissible to show which was intended, on the familiar principle that latent or objective ambiguities may be explained by extrinsic evidence.  *Abbott* v. *Abbott*, 51 Maine, 581.  And a preliminary question is raised respecting the admissibility for this purpose of a written agreement made between Hotchkiss and Edward Brewer, in 1836, and recorded in 1878.  It has frequently been held that other instruments, which were executed between the same parties at the same time and respecting the same subject-matter, may be considered in aid of the construction of any particular instrument, the terms of which are ambiguous.  *Cloyes* v. *Sweetser*, 4 Cush. 403 ; *King* v. *King*, 7 Mass. 496.  But the rule does not apply if the instruments are not between the same parties or do not relate to the same transaction.  *Cornell* v. *Todd*, 2 Denio, 130 ; *Putnam* v. *Steward*, 97 N. Y. 411 ; *Rexford* v. *Marquis*, 7 Lans. 249.

This agreement, between Hotchkiss and Brewer, would seem to have been made in contemplation of a conveyance to Brewer of the same property described in this deed to Higgins, and for the purpose of establishing a division line with respect to Duck Brook stream.  There is a remarkable similarity between the description of this line in the agreement and that in the deed to Higgins.  The distances on the several courses given are the same, and it is contended by the defendant that its language removes all possible doubt respecting the meaning of the terms used in the deed.  But Higgins does not appear to have had any connection with that agreement or even knowledge of it, and there is no allusion to it in his deed.  It was not recorded

until 1878. Furthermore it does not appear that the conditions were fulfilled so that it ever became operative to establish any line on Duck Brook. It was not an instrument required by law to be recorded, and no subsequent purchaser is chargeable with notice of it. True, Brewer acquired title to the same property from Higgins seven years later, but there is no evidence that Brewer had any interest in the conveyance from Hotchkiss to Higgins. This agreement is, therefore, irrelevant and inadmissible.

But placing ourselves in the seats occupied by the parties at the time this instrument was executed and reading it in the light of the internal evidence afforded by the deed itself, is its meaning doubtful? It appears from the deed that Duck Brook was deemed to be a stream of sufficient capacity to be made available for the erection of water power for the operation of sawmills. In the description of the boundary lines, two saw-mills are located upon it and three mill privileges mentioned in connection with it. It is also a fact of special significance to be noted in this connection that Duck Brook itself is nowhere made by this deed a boundary line between the parties. The question is thus removed from the ordinary class of cases where land is bounded on a stream. The general presumption respecting the extension of a riparian grant to the centre of the stream does not apply. The line in the deed crosses the brook three times, dividing it into four sections and leaving to each party the whole stream and land on both sides of it in his respective section. Thus the value of the stream for water power and mill privileges was greatly enhanced. Each could erect a dam entirely across the stream in his own section without infringing upon the rights of the opposite owner. A narrow margin of land on each side of the stream is obviously an appurtenance well-nigh indispensable to the convenient and profitable enjoyment of a mill privilege, and it is known to be a common practice to make a reservation or other provision for such an appurtenance. A strong probability respecting the intention of the parties is thus raised by the reason or motive from which this extraordinary line manifestly originated. It was unquestionably designed that each

should have land sufficient at least for a passage-way on each side of the stream. There is no evidence showing the ordinary width of Duck Brook. But if the four rods are to be measured from the centre of the stream, and as often happens on low and nearly level sections, the stream expands into small basins or flows sluggishly along for considerable distances in a broad and shallow stream, it might at such points become eight rods in width and and no land whatever uncovered by water would pass or be reserved by the deed for use in connection with the mills.

But the language of the deed in the first call, "following down the brook," speaks with no uncertain sound upon this point: "thence from the lower southerly mill-post following down the brook four hundred and fifty-six feet *with four rods of land on the southerly side of the brook.*" In the other courses following, the line runs "within four rods of the brook." The word "of" as well as the word "from" is used as a term of exclusion. *Bonney* v. *Morrill*, 52 Maine, 256. There is nothing, therefore, in the language of the other calls inconsistent with the theory that the measurement was to be taken from the side of the stream. It is wholly improbable that the grantor intended to convey a strip of varying width on the same side, or of different widths on the two sides of the stream. It is most reasonable and consistent to believe that the strips in the different sections were intended to be of uniform width.

In the case of *Dodd* v. *Witt*, 139 Mass. 63, after citing several cases in support of the general rule that a boundary on a way includes the soil to the centre of the way, the court add: "Not one of these cases, however, considers the construction to be given to a deed in which a highway is a point of departure of a measured line. . . The rule is well established when the road is the terminus *ad quem*, but there is little authority when it is the terminus *a quo*, and there is no monument at the other end of the line. A majority of the court is of opinion that it is a common method of measurement in the country where the boundary is a stream or way, to measure from the bank of the stream or the side of the way, and that there is a reasonable presumption that the measurements were made in this way

unless something appears affirmatively in the deed to show that they began at the centre line of the stream or way."

In the case at bar nothing "appears affirmatively in the deed to show that they began at the centre line of the stream," and the implication is wholly to the contrary.

By a natural and legal interpretation of the language of this deed the line in question is, therefore, found to be four rods distant from the northerly side of the brook, above the ebb and flow of the tide.

The language of the deed from Addie R. Hawley to the defendant, plainly and aptly describes this four-rod strip and in connection with the terms of the agreement between Hotchkiss and Brewer, referred to in the deed as "Hancock Registry, book 163, page 49," shows a manifest intention to measure from the side and not from the centre of the stream. This deed also expressly refers to a survey made four years before that date, by Eben M. Hamor, and the description in the deed is identical with that of the survey. The testimony of the surveyor offered by the plaintiff that the measurements of that survey were made from the centre of the stream and not from the side, is clearly inadmissible. It would have the effect to contradict the unambiguous language of the deed. According to the stipulations in the report, the entry must be,                    *Plaintiff nonsuit.*

PETERS, C. J., WALTON, VIRGIN, LIBBEY and HASKELL, JJ., concurred.