### KENDALL v. GREEN & a.

The measurement of land described in a deed as beginning a certain distance from a house is to be made from the side of the house, and not from the edge of the eaves.

An owner of land who saws off the posts of a fence built thereon by a trespasser is not liable for the damage so done, if that method of removing the fence is reasonably necessary to prevent a repetition of the trespass.

TRESPASS. Facts found by the court. The defendants' premises adjoin those of the plaintiff on the east; and the contention relates to the location of the division line. William Green, the original owner of both lots of land, in 1850 conveyed a portion of the land now owned by the plaintiff to Joshua T. Kendall. Soon after, Kendall built a house upon his land. In 1854 Green conveyed to Kendall a strip of land situated on the east side of the tract previously conveyed, describing it as follows: "Commencing twelve and one half feet east of said Kendall's house, and running parallel with said house twelve and one half feet east of it, northerly and southerly, so far as said Kendall's land ex-

tends; meaning to convey to said Kendall a strip of land between the line above described and what we have before deeded to him." The plaintiff now owns the land conveyed to Kendall, and the defendants the land retained by Green. The plaintiff claims that the line above described is located twelve and one half feet easterly of the easterly extremity of the eaves of his house, while the defendants insist that its location is the same distance from the body of the house. The land in dispute is about eighteen inches in width. If the line is where the plaintiff claims it to be, the defendants are guilty.

The plaintiff set fence-posts on what he believed to be the true line, and spiked rails to them. The defendants knocked off the rails and pulled up the posts. The plaintiff reset the posts, and thereupon the defendants sawed them off near the ground. They could have taken them out of the ground with as little labor as was used in sawing them off, but they had good reason to believe if they took them up the plaintiff would again set them on the same line; and they sawed them off to prevent their being reset. The court found the defendants guilty of trespass in destroying the posts, unless they had a right under the circumstances to saw them off.

*Fling & Chase*, for the plaintiff.

*Frank N. Parsons* and *James E. Barnard*, for the defendants.

*Per Curiam.** 1. The line in dispute is "twelve and one half feet east of said Kendall's house;" and the question is, whether the distance is to be measured from the side of the house or from the eaves.

The true test is, What did the parties mean by the language they employed? Probably all so called legal rules of construction were intended to furnish an answer to this question, when it arises with reference to the language of contracts; and no difficulty or apparent injustice is found in their application when they are regarded merely as convenient, reasonable, and useful means of ascertaining the fact of intention, and not as unbending rules of law to be applied without regard to the actual intention. In other words, they may defeat their own admitted purpose when they are supposed to afford in all cases the only competent evidence of the meaning of language as used by parties in written contracts. Being reasonable, and in accordance with common experience in many cases, they may furnish strong evidence of the true construction of a contract in a particular case, but such evidence is not necessarily conclusive. "Legal rules of construction, so called, suggest natural methods of finding and weighing the evidence and ascertaining the fact of intention (*Rex* v. *Poor Law*

---

* See foot-note on page 80.

*Commissioners*, 6 A. & E. 1, 7), but do not determine the weight which the evidence has in the mind, and do not establish a conclusion at variance with that reached by a due consideration of all competent proof." *Edes* v. *Boardman*, 58 N. H. 580, 592.

It would be very convenient and useful if the question of intention could always be truly determined by the mere application of well defined formulas, in the same way that a carpenter ascertains the exact length of a board by applying the foot rule. That courts, in some jurisdictions, may have fallen into the mistake of supposing they had the necessary means at hand, in the form of rules of construction, for mechanically ascertaining the intention of parties, is not evidence that such rules have, or ever had, the force of positive law. As the question to be solved is one of fact, it should be determined like other questions of fact, by the aid of all competent evidence, and not by the exclusion of evidence otherwise competent, nor by the mechanical application of antiquated forms of expression erroneously supposed to express legal principles. If it has been held that the word "heirs" in a deed, for example, is necessary in order to convey a fee, it was not because the law of this state requires the use of the word, but because it was regarded as competent evidence of the intention of the parties, and conclusive if not controlled by other evidence. When, however, it is stated as an unyielding and arbitrary principle of law, all other evidence is thereby excluded, and it as often operates to defeat, as to promote and ascertain, the real intention. "I really believe that almost every case determined by this rule, as applied to a devise of lands in a will, has defeated the real intention of the testator; for common people, and even others who have some knowledge of the law, do not distinguish between a bequest of personalty and a devise of real estate." Lord *Mansfield* in *Loveacres* v. *Blight*, Cowp. 352.

" But when a case arises where the intention of the grantor to convey a fee simple is clearly shown by other words in the deed, we think the court have no power to say a fee shall not pass because he has not, in addition, inserted this technical word, using it in a sense entirely distinct and different from its usual and common import." *Cole* v. *Lake Co.*, 54 N. H. 242, 290. "Difficulties of interpretation could often be avoided if arbitrary rules and technical definitions could be applied to the writing without regard to the author's understanding of its import. . . . The argument for the judicial enforcement of formulas judicially enacted is, the convenience of a mechanical method of construction free from the fault of uncertainty. The argument against it is, the certainty with which it would frequently sacrifice the legal rights of parties to the convenience of the court. . . . When two words or clauses are contradictory and irreconcilable, and there is no other evidence than their relative position to indicate which the testator intended should control the other, their rela-

tive position may have some tendency to prove that during the time elapsing between the writing of the first and the writing of the second he changed his mind, and that the second was intended to express the change. This evidence of fact cannot be turned into a rule of law without an exercise of legislative power. The law prescribes the evidence from which, and the tribunal by which, the meaning of constitutions, statutes, wills, and written contracts shall be determined. An inference of fact drawn from the positions of irreconcilable provisions, or from any other proof contained in a writing, may be safely called a rule of construction or a rule of evidence, if due care is taken to see that the dubious name does not destroy or weaken the distinction between the evidence from which the proper judicial tribunal ascertains the author's mind, and a rule of law established by legislative authority." *Sanborn* v. *Sanborn,* 62 N. H. 631, 643, 644.

" In this state the intention of the parties to a written instrument is determined, not by any technical rules of construction, but, like a question of fact, by the weight of competent evidence. No technical rules of construction applicable to all cases can be established. The intention in each case is determined by the evidence bearing on the case. *Cole* v. *Lake Co.,* 54 N. H. 242; *Rice* v. *Society,* 56 N. H. 191, 197; *Houghton* v. *Pattee,* 58 N. H. 326; *Morse* v. *Morse,* 58 N. H. 391; *Brown* v. *Bartlett,* 58 N. H. 511; *Wilkins* v. *Ordway,* 59 N. H. 378." *Goodale* v. *Mooney,* 60 N. H. 528, 535; *Whittier* v. *Winkley,* 62 N. H. 338, 340.

" The rule *ejusdem generis,* which in the construction of written instruments ordinarily limits the meaning of general words to things of the same class as those enumerated under them, is not conclusive." *Sumner* v. *Blakslee,* 59 N. H. 242, 243. And the obvious reason is, that it is not a rule of law, but an inference of fact; and because it is an inference of fact, it is modified, controlled, and sometimes completely superseded, by other more sensible and weighty inferences of fact, which have never been reduced to the exactness of scientific or scholastic statement. But want of exact expression does not deprive them of their logical force and importance in solving the question of intention. If the very numerous rules of construction to be found in the books are regarded simply as inferences of fact of more or less importance, and if they are not given an undue authoritative effect on account of their antiquity of statement over other equally important rules or evidentiary facts, which on account of their infinite variety and subtilty never have been and probably never will be expressed in dogmatic formulas, the work of construing written instruments and ascertaining the true intent and purpose of parties will be less exposed to the just criticism of intelligent laymen, and less involved in mystery and doubt. The legislative power of establishing a standard by which to measure and discover the intention of parties expressed in written

contracts does not reside in the judicial branch of the government. Nor would the fact of its uniform exercise by judges for centuries be a reason for its continuance under a constitution and system of government which requires the distinction between law and fact to be strictly observed by the judiciary. *State* v. *Hodge*, 50 N. H. 510.

The method of finding facts from evidence is the same, whether that duty is performed by the court or by the jury. If the question of fact of the parties' intention under a written contract should be submitted to a jury, under instructions that there are certain rules of law by which the issue must be determined without regard to the actual intention,—as, for instance, that twelve and a half feet from a house means, as a matter of law, thirteen and a half or fourteen feet from the sill of the house, depending upon the width of the projecting eaves; that " house," as used by the parties, means an imaginary perpendicular plane extending from the extreme outer edge of the overhanging projection to the ground; and that they are not at liberty to disregard these rules, however absurd they may seem to them as practical men,—no more glaring infringement of the province of the jury could be imagined. But when the court takes the place of the jury on such a question, the unconstitutionality of turning fact into law, and defeating the intention of the parties by giving to certain inferences of fact the force of law, is equally apparent. It can no more refuse to use its own judgment and knowledge of common usage among men in finding the fact of intention, than it could deny the same constitutional right to a jury trying the same issue.

As the construction of a written contract presents a question of intention, which is a question of fact, and as that question must be determined by the judge trying the case (*Prescott* v. *Hayes*, 43 N. H. 593, 596, *Drew* v. *Towle*, 30 N. H. 531), it is important to inquire what evidence it is competent for him to consider. If he is not bound by the reported findings of other judges on a similar question of fact, but is free to exercise his judgment, as he would be on an entirely new and unreported state of facts, what evidence is it competent for him to consider, in view of the well established legal proposition, that ordinarily parol or extraneous evidence is not admissible to vary or contradict a written document? *Goodwin* v. *Goodwin*, 59 N. H. 548. It has become an established principle in this state, that " the construction of the written contract is the ascertainment of the fact of the parties' intention from competent evidence." *Crawford* v. *Parsons*, 63 N. H. 438, 443; *Houghton* v. *Pattee*, 58 N. H. 326; *Morse* v. *Morse*, 58 N. H. 391; *Corwin* v. *Hood*, 58 N. H. 401; *Hurd* v. *Dunsmore*, 63 N. H. 171; *Cram* v. *Cram*, 63 N. H. 31; *Whittier* v. *Winkley*, 62 N. H. 338; *Keysar* v. *Covell*, 62 N. H. 283; *McShane* v. *Main*, 62 N. H. 4; *Kennard* v. *Kennard*, 63 N. H. 303; *Edes* v. *Board-*

*man,* 58 N. H. 580, 592; *Sanborn* v. *Sanborn,* 62 N. H. 631; *Johnson* v. *Conant,* 64 N. H. 109. Of course it would be misleading and useless to attempt to prescribe a definition that would include all the competent evidence the court may consider, and that would exclude all incompetent evidence. Nor is such an apparently impossible task necessary in this case. A written contract is presented to the judge, and he is asked to decide what the intention of the parties was in executing it. If the language is plain and unambiguous it cannot be contradicted by extraneous evidence, for that would be giving effect to a contract not reduced to writing, which was not the question proposed. That the parties meant something must be assumed. If they are English-speaking people, and use the English language to express the terms and conditions of their contract, it is safe to say, in the absence of competent evidence to the contrary, that the language of the contract must be understood to convey the ordinary and usual meaning of the English language as used in the community where the parties live. This is a fact which the court must assume or determine at the outset. If some other language is used, the meaning and collocation of the words employed must be interpreted by the practical, grammatical rules of that language, because that must have been the intention of the parties. *Robinson* v. *Tuttle,* 37 N. H. 243, 248.

It is apparent, therefore, that the knowledge which the trier of the fact of intention possesses, with reference to the force of language as ordinarily used, is necessarily competent evidence of the meaning the parties intended should be given to their language. They reduced their contract to writing, knowing that, in case litigation should arise as to their respective rights thereunder, the knowledge and experience of the judge in the use of language must be employed as evidence of the meaning the contract was intended to convey. This knowledge and experience of the trier becomes evidence, as a matter of law, from legal necessity, and is as binding on parties as though it had the sanction of express legislative enactment, or was expressly referred to in their contract as the test by which the meaning of their language should be determined. This is a rule of evidence that has never been wholly disregarded, although the practice of confounding so called rules of construction with rules of law has sometimes seriously trenched upon it, rendering the trier little more than a mechanical automaton, used merely for the purpose of measuring intention in all cases by fixed and arbitrary standards. The true question is, what did the parties mean, "and not how meaningless their words can be made by the application of arbitrary rules." Cool. Const. Lim. 75.

But as the same word or series of words may convey very different meanings, according to the circumstances under which they are used or the subject-matter to which they apply, the situ-

ation of the parties, their general purpose in the transaction, and all apparent circumstances connected therewith, are competent evidence of the intention expressed by particular words and phrases in the contract. *Nettleton* v. *Billings*, 13 N. H. 446. Language, independent of the subject-matter or the author's general purpose, is usually meaningless and obscure. The inconvenience, hardship, or absurdity which one construction would lead to is often strong evidence in favor of another or different construction involving no objections of that character, because men in general do not enter freely into contracts which are absurd or frivolous, and therefore the knowledge of the court on that subject is evidence of the intention of the parties. *Alcutt* v. *Lakin*, 33 N. H. 507, 510; *Lowell* v. *Strahan*, 145 Mass. 1; *Haight* v. *Hamor*, 83 Maine 453, 457.

" It is improbable that two men have understandingly entered into a bargain which contains a stipulation plainly and clearly to the disadvantage of both. *A priori*, they would not be likely to do such a thing; therefore, *a posteriori*, it is not likely they have done it. The language of their deed is to be read in the light of this improbability.

" This consideration, with others of a like nature, has led courts to adopt the rule of construction we are discussing, said to rest on a presumption that where the granted premises are bounded by or on a highway, it was the intention of the parties to treat the whole strip as a monument, and locate the line at the centre; in other words, upon a conclusion of fact as to the intention of the parties, made up by the court from a consideration of the nature and situation of the thing to which the deed relates, in connection with the literal language in which they have undertaken to express that intention." *Woodman* v. *Spencer*, 54 N. H. 507, 512. It is unreasonable to assume that when the grantor owns land to the centre of a highway on one side, and bounds the land " by or on " the highway, he intends to retain the ownership of the narrow strip within the limits of the highway subject to the public easement, or that the grantee understood that he was not to enjoy the rights ordinarily belonging to ownership of land bounded by a public road. It is the very great improbability that the parties intended a result so absurd that leads to the conclusion, in the absence of evidence to the contrary, that they had no such intention. But if the land conveyed is bounded on another side " by or on " another adjoining field of the grantor, an intention to include one half of that field, or any other fractional part of it, in the description of the land conveyed, could not be found, for there is no evidence to support such a finding. All the evidence would lead irresistibly to the opposite conclusion, and the boundary would be found to be the border line of the last mentioned field. Although the mere words of the deed are the same in both cases, the subject-matter to which they apply

is different, which affords sufficient evidence of a different intention. *Woodman* v. *Spencer*, 54 N. H. 507, 511.

The fact that the decisions are almost unanimous in holding that ordinarily land bounded on or by a highway, or a stream of water not navigable, extends to the centre of the way or stream, is due primarily to the evidence of intention ascertained in the manner above indicated. *Reed's Petition*, 13 N. H. 360, 381; *Rix* v. *Johnson*, 5 N. H. 520; *Nichols* v. *Suncook Mfg. Co.*, 34 N. H. 345; *Kimball* v. *Schoff*, 40 N. H. 190; *Woodman* v. *Spencer*, 54 N. H. 507; *Sleeper* v. *Laconia*, 60 N. H. 201; *McShane* v. *Main*, 62 N. H. 4; *Kent* v. *Taylor*, 64 N. H. 489; *Gardner* v. *Webster*, 64 N. H. 520; *Goodrich* v. *Railroad*, 37 N. H. 149, 169; *Jackson* v. *Hathaway*, 15 Johns. 447, 454; *Warner* v. *Southworth*, 6 Conn. 471; *Hamlin* v. *Pairpoint Mfg. Co.*, 141 Mass. 51, 56; *Motley* v. *Sargent*, 119 Mass. 231; *Boston* v. *Richardson*, 13 Allen 146, 154. Under some circumstances similar evidence may show that the line is so located as to include or exclude the whole of the way. *Thompson* v. *Major*, 58 N. H. 242; *In re Robbins*, 34 Minn. 99; *Holmes* v. *Turner's Falls Co.*, 142 Mass. 590, 592; *Dunham* v. *Williams*, 37 N. Y. 251; *Church* v. *Stiles*, 59 Vt. 642.

When the bound is a tree, a post, or a fence, the question might arise whether the line should be deemed to run through the centre of the object or on one side of it, and if through the centre, whether at the foot of it, or at the top, as this would be a matter of importance in the case of a leaning tree or post used as a bound. The first question has often been answered by the courts, and the finding has been, that the centre of the tree or post defines the line. Tied. Real Prop., s. 838. If a line is run "by" a tree standing on land of the grantor, there is nothing to indicate which side was intended; and the want of evidence on that point is evidence that neither side was intended, but that the centre of the tree was the point through which the parties conceived the line to pass. But if the tree or post is used, not as a bound on a described line, but as the starting-point from which to measure a given distance, there would be no such evidence to consider, and it would be difficult to conceive why, if the parties intended to measure not from the side, but from the centre of the tree or post, they did not say so. *Dodd* v. *Witt*, 39 Mass. 63, 65; *Bonney* v. *Morrill*, 52 Me. 252, 256.

But suppose a leaning tree is selected as a bound " by " which a division line is run, and one party claims it passes through the centre at the top, which might locate the line on the ground twenty feet from the base of the tree, while the other party claims that the point intended is in the centre of the tree at the surface of the ground: the only possible argument or evidence in favor of the first claim is the literal meaning of the words of the deed, which do not necessitate such a construction. But the practical

inconvenience of climbing trees and dropping plumb-lines from their branches, or of employing engineers skilled in the use of instruments of mathematical precision to locate the line, as well as the fact that men in general do not establish boundary lines in that way, is conclusive evidence that the line was intended to be run on the ground and through the centre of the tree. The uniformly recognized practice of men of ordinary intelligence, to measure boundary lines on the ground and not at points located at inconveniently high altitudes above the surface of the earth, is evidence which the court necessarily possesses, and would be bound to use on a question of this sort. Is the court to feign ignorance of a practice which everybody else acknowledges, and, perchance, reach a result in conflict with it? Does the location of a boundary mean one thing to the great body of laymen, and something radically different to lawyers? It would be a gross travesty on justice to say that the court, on a mere question of fact, might or ought to reach a different conclusion from that entertained and acted upon by men in general.

The first bound established by the deed in this case is "twelve and one half feet east of said Kendall's house." There is no conveyance of the house, and the question whether the land covered by the projecting eaves passes as a part of the land under the house is not presented. There are forcible reasons for the position that in a conveyance of a house the parties intend that the land directly below the eaves should be conveyed with the house. It is not unreasonable to infer that the grantor of a house intends that the purchaser shall thereby acquire title to all land under and necessary to the reasonable enjoyment of the house; that land upon which the drippings from the eaves fall is necessary, and that it is, therefore, included in the conveyance. If it were otherwise, and the grantor retained the land up to the sill of the house, he might compel the grantee to cut off his projecting eaves, or he might saw them off himself, and thus lawfully disfigure and materially injure the property of his grantee, — a result which the parties as reasonable men could not have intended. Cases, therefore, holding that a conveyance of a house passes land under the eaves are not germane to the present inquiry. *Carbrey* v. *Willis*, 7 Allen 364; *Sherman* v. *Williams*, 113 Mass. 481; *Goodrich* v. *Railroad*, 37 N. H. 149, 169. The opinion of the court in *Millett* v. *Fowle*, 8 Cush. 150, amounts to little more than an arbitrary *dictum*, supported neither by a discussion of principles nor by a citation of authorities. If it is based on decisions holding that a conveyance of a house includes the land under the eaves, the analogy fails; for the reasons that apply in those cases are wanting in that case.

In *Dodd* v. *Witt*, 139 Mass. 63, a deed described a boundary as "commencing on the road, . . . thence west . . . ten rods;" and the question was, whether the ten rods was to be

measured from the side or from the middle of the road. After referring to *Peck* v. *Denniston*, 121 Mass. 17, where it was held, in accordance with numerous cases cited, that land bounded on a way ordinarily extends to the middle of it, the court say, on page 65,—"Not one of these cases, however, considers the construction to be given to a deed in which a highway is a point of departure for a measured line. . . . The rule is then well established when the road is the *terminus ad quem*, but there is little authority when it is the *terminus a quo*, and there is no monument at the other end of the line. A majority of the court is of opinion that it is a common method of measurement in the country, where the boundary is a stream or way, to measure from the bank of the stream or the side of the way; and that there is a reasonable presumption that the measurements were made in this way, unless something appears affirmatively in the deed to show that they began at the centre line of the stream or way. "

"The difference between land when bounded by a building, and a way when thus bounded, is very obvious. When land is bounded by a building, it would be unreasonable to assume that the parties to the conveyance intended that the main portion of the building should be on one side of the line, and the cornices and other projecting finish on the other. Hence the rule, that in such a case the line shall be regarded as wholly on one side of every portion of the building. Not so a right of way. There is nothing unreasonable in the assumption that a mere right of way, even if created by an express grant, was intended to extend under the projecting finish of a building. Hence the rule invoked by the plaintiff is not applicable, and especially not applicable when, as in this case, the right of way is acquired by adverse use, and not by express grant. . . . If we should adopt the construction of the statute for which the plaintiff contends, and hold that all bay-windows and balconies and cornices, which have for twenty years overhung our sidewalks, have become boundaries thereof, we should have some very crooked and jagged side lines, and it would be difficult for our street commissioners to determine to what width it would be their duty to keep them in repair. We do not think the statute can be rightfully so construed. We think that when it declares that buildings which have for more than twenty years fronted on a public way or street shall be deemed the bounds thereof, it means that portion of the building which rests upon the ground and does in fact bound and limit the way, and not the cornices or other projections which, far above the heads of travellers, may happen to overhang the sidewalk." *Farnsworth* v. *Rockland*, 83 Me. 508; *Bonney* v. *Morrill*, 52 Me. 252. In *Centre Street Church* v. *Machias Hotel Co.*, 51 Me. 413, it was held that "eight feet four inches from the south side of the meeting-house" should be measured from the corner board of that side, and not from the outer edge of the eaves.

In *Union Pacific Railroad* v. *Hall*, 91 U. S. 343, it appeared that congress had authorized the plaintiff "to construct a single line of railroad and telegraph from a point on the western boundary of the state of Iowa, to be fixed by the president of the United States, upon the most direct and practicable route, to be subject to his approval, so as to form a connection with the lines of the said company at some point on the one hundredth meridian of longitude aforesaid, from the point of commencement on the western boundary of the state of Iowa." One question was, what was meant by "the western boundary of the state of Iowa." In the opinion, Justice *Strong* says,—"The legal boundary of the state is the middle of the channel of the Missouri river. 9 Stat. at L. 52. But it is very evident that congress did not intend that the road should start from a point in the mid-channel of the river. That would be impossible; and, were it possible, it would not carry out the general design of the act. . . . Congress may well be supposed to have used language in accordance with the common understanding. It is common usage to speak of the boundary of a state or county as a river, though the legal boundary may be the middle of the river; and particularly when anything is to be constructed on such a boundary, which from its nature must be constructed on dry land, would no one understand the place of construction as any other than the shore of the river. It is perfectly legitimate, and in accordance with every-day usage, to say that a house built in Illinois on the eastern shore of the Mississippi stands on the western boundary of the state, though the legal boundary of the state is the mid-channel of the river. In common understanding, therefore, a point on the western boundary of Iowa would be a point in Iowa on the eastern shore of the Missouri, precisely as a point on the eastern boundary of Nebraska would be understood to be in Nebraska, on the western shore of the river."

"The plaintiffs, by their charter, were entitled to carry the road 'to the city of Hudson.' This did not mean that the road was to terminate on arriving at the north bounds of the city, which was the middle of Major Abraham's creek, and several miles from the compact part of the city. The words are to receive a more reasonable interpretation, in reference to the subject-matter, and the public object of the grant, which was to open a good road from Troy to the compact part of the city of Hudson." *Farmers' Turnpike Road* v. *Coventry*, 10 Johns. 389, 392.

Nor does the definition of the word "house" necessitate a construction that in this case the most easterly projection of Kendall's house was intended. "House" may have various meanings, dependent upon or made evident by the purpose of the parties and the subject-matter of the contract. When it is the subject-matter of a deed or other contract, it may be found to include other buildings not popularly known as houses, or a garden, an

orchard, etc. (*Marston* v. *Stickney*, 58 N. H. 609), or a stable (*Bridge* v. *Bridge*, 146 Mass. 373, 377) ; it may even exclude the approaches or steps leading up to it. *United States* v. *Mueller*, 113 U. S. 153.

In this case no question of title to Kendall's house arises. It is merely an object from which a definite measurement is to be made to determine the location of the division line. The parties must have intended the measurement to be made either from the external line of the. eaves, or from the foundation of the house. As no reason appears why they should have had the eaves in mind, and as it would be difficult, if not impracticable, to make the measurement from that high projection, the probability amounting almost to certainty is, that their intention was that the division line should be determined by measuring twelve and a half feet from the foundation. If this result conflicts with the contract the parties understood they were making, there may be occasion for a reformation of the deed upon a bill in equity. It is not the province of the court to make contracts for parties ; but when upon a legal construction of a contract the result is materially different from what the parties contemplated or understood they had agreed upon, they may be relieved in equity by a cancellation or reformation of the contract.

2. The claim is made that the plaintiff is entitled to recover damages for the destruction or mutilation of his fence-posts, which he set in the defendants' land, and which the latter sawed off. It is not found that this method of preventing the plaintiff's threatened trespasses was an unreasonable one for the defendants to adopt in the protection of their property. They had the right to remove the incumbrance which the plaintiff wrongfully placed upon their land, and if it was reasonably necessary to saw off the posts to prevent the plaintiff's resetting them, the defendants were justified. What is legal and proper to be done to protect one's property from the depredations of trespassers or intruders is to a great extent a question of fact depending upon the special circumstances of the case. *Aldrich* v. *Wright*, 53 N. H. 398 ; *Hoit* v. *Stratton Mills*, 54 N. H. 109, 116. In the absence of a finding that the defendants exceeded the limits of reasonableness in their attempt to restrain the plaintiff's continued trespassing, they are not liable for the resulting damage.

*Judgment for the defendants unless the deed is reformed.*

CHASE, J., did not sit : the others concurred.