Coös,        }
June, 1899.  }

## Heywood & a. v. Wild River Lumber Co. & a.

Where a disputed divisional line is described in a public grant as running to
the northwesterly corner bound of a township, the existence and location of
which were known to the parties to the original conveyance, such monu-
ment will control such line as to private ownership, although the jurisdic-
tional line of the town may have been varied by a subsequent survey.

A recognition of a divisional line in conveyances is admissible in evidence
against the grantor's successors in title, but is not conclusive in the absence
of circumstances constituting an estoppel.

The taxation by a town of land beyond its original jurisdictional limits does
not affect private titles.

A claim as to the location of a boundary line defined in a deed, by the owner
of land and his predecessors, is immaterial in a dispute with an adjoining
owner, in the absence of evidence that the latter, or his ancestors in title,
knew of such claim and acquiesced therein.

The familiar principle that monuments referred to in a deed, when ascer-
tained, control courses and distances, is merely a statement of the general
result from evidence competent upon the question of intention, and not
properly a rule of law.

BILL IN EQUITY.  Facts found by a referee.  The plaintiffs own lands in Jackson bounded by the northerly line of the town, claiming under a grant from the state to Daniel Pinkham in 1835; and the defendants own adjoining lands in Bean's Purchase, claiming under a grant from the state to A. Bean in 1832.  The controversy relates to the location of the dividing, or town, line.

Jackson was chartered in 1800 as the town of Adams, and its northerly line is described in the charter as follows: "Beginning at the most northerly corner bound of a tract of land granted to Wentworth and Rogers, from thence runs south eighty-one degrees east seven miles, to the northwesterly corner bound of Chatham." The point of beginning is identical with the northwest corner of Rogers, Wentworth & Treadwell's Location, and was located prior to 1800.  The parties agreed upon the location of this point, hereinafter called A.  A line run from it according to the charter brings the northeast corner of the town about two hundred rods northerly of the northwest corner of Chatham as now established. When Adams was chartered there was no monument upon the ground at the northwest corner of Chatham as now established, and no line had been ascertained and marked for a north line of the town near that point, if at all.  The northeast corner of Chatham had been established at what is called the "mill corner."  In 1804 a line was run by Chatham (in compliance with the act of 1803 requiring towns to make surveys for the Carrigan map) for its north line, trees were spotted in the line, and the northwest corner was marked, called herein the "old spruce corner."  This line and this corner were recognized as the north line and the northwest corner of the town until 1847.  In that year a new line between Jackson and Chatham was run, and a corner called the "commissioners' corner" was established about sixty rods further westerly than the "old spruce corner," but substantially in the same north line; and this corner has been recognized as the corner by Chatham and Jackson since that time.  The north line of Chatham being difficult to run, because it passes over Bald Face mountain, was not run straight in 1804, and its length was not accurately measured.  The parties agreed that the "old spruce corner" is located nearer the point where it would fall by measuring the required distance from the state line than the "commissioners' corner," and that the distance does not overrun more than most distances chained at so early a date.  If the line had been run straight on the course given in the charter of Chatham (granted in 1767), the northwest corner would be at a point (herein called B) twenty-four rods distant from the "old spruce corner" in a line running from that corner north fourteen degrees thirty minutes east.  The course of the line in 1897 would be north seventy-five degrees thirty

minutes west, while the course of a line run from the "mill corner" to the "old spruce corner" would be north seventy-six degrees thirty minutes west. A line running from A to B varies about five degrees from the charter course of the north line of Jackson. No such line is marked upon the ground. Jackson had nothing to do with locating the "old spruce corner," nor with running the north line of Chatham.

One Pinkham attempted to perambulate the easterly and northerly lines of Jackson for the town in 1830. He did not allow the correct variation of the compass needle, and in running ·the east line, starting at its southerly end, he hit the north line, as he considered it, more than one hundred and eighty rods westerly of the "old spruce corner," but substantially in the same north line,— evidently recognizing it as the correct line. About that time a line was run westerly, with the same error in the point of compass, and struck near the west line of the town more than two hundred rods southerly of the northwest corner. The running was found to be incorrect and was not recognized by the town. In 1839, Cyrus F. Pinkham, in surveying lots in the easterly part of Jackson under the Pinkham grant, ran substantially to the "old spruce corner," evidently recognizing that as the north line of the town, although his line struck some twelve or fourteen rods farther east than that corner.

From the foregoing facts, the referee found that the "old spruce corner" was recognized as being the northwest corner of Chatham until 1847, and was understood to be the northeast corner of Jackson. It was not found, however, that the plaintiffs or their grantors ever recognized it as the corner, except in the sense that they understood it to be the corner as other people of Jackson did. The parties agreed that it, rather than the "commissioners' corner," should be regarded as the corner. No line running from A to the "old spruce corner" is marked upon the ground.

If the course given in the charter of Adams for the north line of the town, under the circumstances existing at the date of the charter, fixes the location of the line, it would be a line run from the point A south seventy-six degrees six minutes east, until it intersects a line running from the "old spruce corner" north fourteen degrees thirty minutes east.

If the north line of Chatham was ever farther north than it is now, it had ceased to be the north line of the town prior to 1800. The only line recognized by the inhabitants as the north line, after the resurvey of the town in 1792, was the line starting from the "mill corner," and running westerly on the course stated in the charter.

On the question whether there has been such a recognition of,

or acquiescence in, the line claimed by the plaintiffs as to make it the north line of the town, or whether there has been such adverse possession as would give the plaintiffs a title to the land extending to that line, the referee reported in substance as follows: There is in the northwesterly part of Jackson a triangular tract of land containing five hundred acres, called the Carlisle tract, which was conveyed by Daniel Pinkham, the state's grantee, to Thomas Carlisle, in 1837.  Although the courses given in Pinkham's deed to Carlisle for the northerly and southerly lines of the tract vary from the courses of the northerly line of Jackson, and the northerly line of Rogers, Wentworth & Treadwell's grant, the tract was evidently intended to be bounded on the north by the town line, and on the south by said grant; at least, it was so located in 1854 by one Barker, a surveyor, so far as to mark trees at the southeasterly and northeasterly corners, and spot a line between them.  The referee was unable to find that the northerly line of the tract was marked upon the ground prior to 1885.  In that year Jackson undertook to perambulate its northerly line, and spotted a line running from the point A substantially on the charter course.  This line is called the "Meserve line."  The Carlisle tract has been taxed in the town of Jackson for fifty years or more to the respective owners thereof, the description being five hundred acres in the northwest corner of Jackson, sometimes as a part of the Pinkham grant and sometimes as the Carlisle tract.  One of the owners to whom it was formerly taxed was Joseph Hobson, and at the time of and prior to such taxation he was an owner of Bean's Purchase.  Since 1890 there has been some cutting of timber on the easterly part of the tract, nearly or quite to the "Meserve line." It did not appear that any question was raised as to the rightfulness of such cutting or the rightfulness of the taxation aforesaid.  No acts of actual occupation of the tract prior to 1890 were shown.

The plaintiffs own a tract of three thousand acres, adjoining the Carlisle tract on the east and bounded on the north by the town line.  For fifty years or more prior to the time when the plaintiffs acquired their title this tract had been owned by tenants in common, and they respectively had been taxed in Jackson for the number of acres they owned, described as parts of the tract in the Pinkham grant, or as Turnpike land, or in a way to designate the same as parts of the tract.  The tract was surveyed by Barker in 1854, and the lines spotted.  His line at the northeast corner of the Carlisle tract was about six rods southerly of the "Meserve line," and ran thence easterly substantially on the charter course of the town line.  It is evident that he did not make the northeast corner of the tract far enough east by about one hundred and

HEYWOOD *v.* LUMBER CO.

sixty-seven rods, as the tract should extend to what is called the Carlisle lotting in the easterly part of the town. There is room enough for the tract, if the north line runs where the defendants say it should; but there is not room enough for the Carlisle tract between the town line and the northerly line of the Rogers, Wentworth & Treadwell grant. It did not appear that Jackson attempted to perambulate its north line prior to 1885, unless it did so in 1830, as before stated. The "Meserve line" of 1885 followed the Barker line for a long distance and extended as far east as the easterly line of the town. Owners of land comprised in the tract of three thousand acres cut timber therefrom in different years, some of the cutting being nearly twenty years before the commencement of this suit. They understood that the Barker line was the town line and so claimed, but the cutting did not extend to it and was mostly south of the line claimed by the defendants. There had been no such cutting as to give title by adverse possession to the Barker line. It did not appear that the owners of Bean's Purchase ever objected to the cutting, or knew of any cutting north of the line claimed by them. The referee was unable to find that they recognized and assented to the Barker line as the true line of the town, or the division line between their lands and the tract, unless it is held that the taxation of the Carlisle tract to Hobson and his payment of the taxes without objection, or this together with his receiving and making conveyances of the same, constitute an assent in law.

The inhabitants of Jackson and the respective owners of lands in the tract of three thousand acres have apparently understood that the north line of the Carlisle tract and the Barker line were the north line of the town, and, if extended, that it would strike the " old spruce corner," or the " commissioners' corner," or both, which they understood to be the northeast corner of the town.

The parties respectively moved for a decree in their favor upon the report.

*Henry Heywood* and *Ladd & Fletcher*, for the plaintiffs.

*Drew, Jordan & Buckley* and *George H. Bingham*, for the defendants.

PARSONS, J. The controversy relates to the north line of the town of Jackson. Jackson was incorporated under the name of Adams in 1800, and included grants which had been made before that date to various persons and a quantity of ungranted state land. The northerly line is described in the charter as follows: "Beginning at the most northerly corner bound of a tract of land granted to

Wentworth and Rogers, from thence runs south eighty-one degrees, east seven miles to the northwesterly corner bound of Chatham." At the date of the Adams charter, the north line, according to either claim as to its exact location, passed through ungranted state lands of which no grants adjoining this line appear to have been made except those under which the parties claim. Their rights are therefore determined by the answer to the question: what was meant or understood by the north line of Jackson at the date of their respective grants?

The charter of Adams in 1800 was not a grant of land. It appears to have been granted, as stated in the preamble, upon a petition " requesting that certain locations, with other lands situate in the county of Grafton, might for certain reasons therein stated be incorporated into a town." The charter enacts that "the inhabitants of said locations and state lands bounded as aforesaid are hereby erected into a body politic and corporate to have continuance and succession forever, and are invested with all the powers, privileges, rights, benefits, and immunities which any town in the state by law hold and enjoy."

By virtue of this act no private title passed to the ancestors in title to the parties to this suit, or to any one. The state lands through which the northern jurisdictional line of the new township passed remained ungranted as before. The location of this line for jurisdictional purposes was subject to change at the legislative will. Its actual *situs* upon the ground might be determined by a practical location long established and acquiesced in (*Hanson* v. *Russel*, 28 N. H. 111, 116, 117), even if such line were variant from that described in the act of incorporation. *Wells* v. *Iron Co.*, 47 N. H. 235, 262. Such location, however, would not determine or affect private titles; and if at the date of subsequent grants an established line existed variant from the charter line, the question which line limited a private grant would be determined by the answer to the question of fact, which line was meant. *Hanson* v. *Russel, supra.*

The north line of Jackson (Adams) was defined as extending from a point now undisputed, upon a certain course, to the northwest corner bound of Chatham. The present controversy arises from the fact, undiscovered for eighty-five years after the grant, that such a line on the course named does not strike the northwest corner bound of Chatham, but passes two hundred rods northerly. Chatham was granted and incorporated in 1767. In 1800, there was no monument upon the ground at the northwest corner of Chatham as now established, and no line had been ascertained and marked for the north line of the town near that point, if at all; but the northeast corner had been established at what is called the "mill

corner." In 1804, a line was run by Chatham (in compliance with the act of 1803, requiring towns to make surveys for the Carrigan map) for its north line, and trees were spotted in that line, and the northwest corner, called the "old spruce corner," was marked. In 1847, in running the line between Chatham and Jackson, a corner was established, called the "commissioners' corner," in the same north line, about sixty rods westerly of the "old spruce corner." From 1804 to 1847, the "old spruce corner" was recognized as the northwest corner of Chatham and understood to be the corner of Jackson; and since that time the "commissioners' corner" has been recognized as the corner of Chatham and Jackson. It is apparently of no importance in this case whether the "commissioners' corner" or the "old spruce corner," both in the same north line, should be regarded as the established corner of Chatham; and the parties have agreed that, for the purposes of this case, the latter should be so considered. The north line of Jackson was not run through until 1885, and no attempt appears to have been made to locate any part of it until 1854, except about 1830, when a line was run which was found to be incorrect and was not recognized by the town.

The north line of Chatham was not run with entire accuracy in 1804. If run from the "mill corner" on the charter course correctly, the northwest corner would fall twenty-four rods northerly of the "old spruce corner." The plaintiffs claimed that the north line of Chatham was originally located farther north, making the northwest corner of that town identical with the northeast corner of Jackson as claimed by them, and that there was a monument of some sort for such a corner marked on the ground at the date of the charter of Adams. The referee finds that these claims were not sustained by the evidence. It is also found that the only north line recognized by the inhabitants of Chatham since 1792 was the one leading from the "mill corner," and that if any line or corner further north had been claimed, the same was abandoned before 1800. The most northerly corner bound of the grant to Wentworth and Rogers, the starting point of the north line of Jackson, was known. The northwest corner of Chatham, the terminal point, had been marked and established on the ground for thirty years. The charter of Adams furnished the information that the north line of Jackson was the straight line connecting these points, with the additional information that this line was seven miles in length and ran easterly south eighty-one degrees east. No line was marked on the ground. No attempt had been made to discover whether the course and distance laid down for the north line of Adams was or was not correct. No claim had been made or was made, up to the time of this controversy, that the northeast corner of Jackson was at any

place except the established northwest corner of Chatham.   What did the parties mean, in 1832 and 1835, by the north line of Jackson?  It is "an established principle in this state, that 'the construction of the written contract is the ascertainment of the fact of the parties' intention from competent evidence.'"   *Kendall* v. *Green*, 67 N. H. 557, 561, and cases cited.   What evidence is competent, in view of the well-established legal proposition that ordinarily parol or extraneous evidence is not admissible to vary or control a written instrument, may be an important question; but it would be "useless to attempt to make a definition that would include all the competent evidence and would exclude all the incompetent," and that would be applicable to every case.

"But as the same word or series of words may convey very different meanings according to the circumstances under which they are used or the subject-matter to which they apply, the situation of the parties, their general purpose in the transaction, and all apparent circumstances connected therewith, are competent evidence of the intention expressed by particular words and phrases in the contract."   *Kendall* v. *Green, supra.*   "In the construction of written instruments, the intention of the parties is what is sought; and to ascertain that intention, regard may be had to the nature of the instrument itself, the situation of the parties executing it, and the purpose they had in view."   *Corwin* v. *Hood*, 58 N. H. 401, 402.

To understand the language of the parties, it is necessary to put ourselves in their position.   In 1832 and 1835, the state parted with its title to the ungranted lands through which the northern line of Jackson ran, conveying to the plaintiffs' ancestors in title all its ungranted land in Jackson and to the defendants its land bounded south by Jackson.   If there were at this time two or more northerly locations for Jackson north line, it would be merely a question of fact which line was the one meant by the parties. There were, in fact, no lines marked on the ground.   The two termini of the line were marked.   The western was known; the eastern was at the northwest corner bound of Chatham, which had been located and recognized as such for over thirty years.   The line was a straight line, and was of a certain length and course. The country through which the line passed was a wilderness in which lines were run and distances measured with accuracy only with great difficulty.   The general principle, repeatedly recognized, that in the description of a line that which is most material and certain  shall control  that which is less material  and certain; that boundaries marked on the land, as being most material and certain, are to govern courses and distances; that if a line described in a deed or charter and the monuments upon the ground do not correspond, the monuments are always to determine

the true location (*Hall* v. *Davis*, 36 N. H. 569, 571), — often erroneously referred to as a rule of law rather than a recognition of the fact that upon the question of intent the fact must be found according to the weight of the evidence, — is merely the statement of the general result from the weight of evidence.

Nothing is found as to the course and line of Jackson in 1832 to produce a different result in this case, and to lead to the understanding that at that time this particular course and distance was not subject to the usual infirmities as to inaccuracy reasonably to be expected. Upon a balance of the evidence, it cannot be found that the parties intended the course and distance instead of the monument. When the state bounded its grant to Bean, in 1832, upon the south by the north line of Jackson, the parties meant the only line that was known at that time, — a line running to the northwest corner of Chatham at the point where the corner had been located for thirty years. They did not mean a line to a corner · which never existed, or which had been abandoned, — a mere tentative location, — but an actual, *bona fide*, corner bound. Such the " old spruce corner " is found to have been. Neither did they mean a corner which should exactly, with the precision of the growth of one hundred years in civilization and value, now be located with mathematical exactitude by measuring from the " mill corner," because they knew of no such corner. One corner, and one only, having been established and known, the parties must have intended the corner known to them. The language they used meant something to them. It is unnecessary, upon this view, to consider whether the jurisdictional line of Adams was affected or established by the location by the proprietors of Chatham of their northwest corner. It is immaterial whether it was or not. The line was subject to legislative change. A change after private titles had attached would not affect the lines of private lands ; they would be bounded as before by the old line. The only point material in this case is that, at the date of the deeds from the state, the north line of Jackson was a line running to the corner bound of Chatham. If, after the partition of the territory, the leglislature had defined the north line of Jackson as running to a point two hundred rods north of the " old spruce corner," that would not have affected these titles, because the line intended by them was the line running to the " old spruce corner. " There is no evidence that any other line was then known or imagined. The state, Bean, or Pinkham could not have meant to bound or be bounded by a line unknown and unimagined.

At the time of the conveyance to Bean and Pinkham no part of the north line of Jackson had been marked. There could have been no occupation by private owners defining the line claimed on the one

side or the other because there was no private ownership. There is no evidence of any acts on the part of Jackson or Adams defining the line of its jurisdiction before 1885, except the futile attempt at perambulation in 1830, which, so far as it goes, supports the defendants' claim. Landowners in Jackson understood the line ran on the charter course, from the west end to the "old spruce corner." If this line had been marked out through any portion of its extent, and claimed and occupied to with the assent of the owners upon the north, the line of private ownership might have been established differing from the straight line of the charter course. On this question the referee reports that there has been no such occupation by the plaintiffs or their grantors up to the line claimed by them as to give them title by adverse possession, and that he is unable to find that the defendants recognized or assented to the line claimed by the plaintiffs, unless the taxation of what is called the Carlisle tract to one Hobson, his payment of the taxes assessed thereon, together with his acceptance of and giving deeds of the tract while owning Bean's Purchase, make an assent in law. The facts reported were evidence upon the question of adverse possession and the defendants' grantor's knowledge of and acquiescence in the line claimed by the plaintiffs. The evidence, taken most strongly for the plaintiffs, tended to establish an admission by the defendants' grantor in possession sustaining the plaintiffs' contention. No estoppel is claimed. In the absence of facts establishing that it would be inequitable to permit the defendants now to make a contrary claim, the admission is merely evidence of the fact and is not conclusive as matter of law. *Parker* v. *Brown,* 15 N. H. 176, 184 ; *Hobbs* v. *Cram,* 22 N. H. 130 ; *Corbett* v. *Norcross,* 35 N. H. 99 ; *Richardson* v. *Chickering,* 41 N. H. 380. The plaintiffs' grantors were taxed for three thousand acres in Jackson. They had that amount of land upon the defendants' claim as to the location of the line. Under these circumstances, the taxation of three thousand acres by Jackson would not seem to amount to a jurisdictional claim over more than that amount of land. If such taxation under the circumstances was an assertion of jurisdiction over land north of the line to the " spruce corner," and if long exercise of such right can establish it, the result would be to change to that extent the jurisdictional line of Jackson. But a change in the jurisdictional line does not affect private titles. Between the plaintiffs and defendants, the question would still remain whether by acts of the parties the line of private ownership had been correspondingly established. Upon this question the fact of taxation is not of itself conclusive.

The defendants' grantor, Bean, obtained his title from the state in 1832. His south line as defined in his deed could not be affected

by any construction put upon the grant of the state to Pinkham in 1835, by the parties to that conveyance. The evidence of Pinkham's understanding of his north line, furnished by his deed in 1837 of the five-hundred-acre tract in the northwest part of his grant, is therefore immaterial, in the absence of a finding that the plaintiffs or their predecessors in title knew and acquiesced in such claim.

The conclusion is that the line between the parties is a line running to the " old spruce corner " of Chatham from the agreed starting point.

*Decree for the defendants.*

All concurred.