SAUNDERS v. PUBLISHERS' PAPER CO. et al.

(District Court, D. New Hampshire. September 17, 1913.)

No. 580.

1. EVIDENCE (§ 461*)—DEEDS—CONSTRUCTION—ADMISSIBILITY OF PAROL EVIDENCE—AMBIGUITY.

If the intention of the parties can be ascertained from the language of a deed when the court places itself as nearly as possible in the situation in which they were when the writing was made, parol or extraneous evidence of their intention is not admissible; but if, in attempting to apply the language to the subject-matter, two situations should be presented, either of which would answer the terms of the writing with equal certainty, parol evidence is admissible to prove which of the two situations the parties had in mind.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2129–2133; Dec. Dig. § 461.*]

2. BOUNDARIES (§ 6*)—CONSTRUCTION—BOUNDARIES OF GRANT FROM STATE.

A deed from the state of New Hampshire for a grant of land made in 1830 construed as to the boundaries of the grant.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 47–57; Dec. Dig. § 6.*]

3. JUDGMENT (§ 685*)—PERSONS CONCLUDED—PRIVITY BETWEEN MORTGAGOR AND MORTGAGEE.

A mortgagee of land is not estopped by a decree affecting the mortgagor's title in a suit to which he was not a party and which was commenced after the mortgage was given in a state where the mortgagee is the owner of the legal title, subject only to the mortgagor's equity of redemption.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1208; Dec. Dig. § 685.*]

4. MORTGAGES (§ 144*) — COVENANT FOR TITLE — AFTER-ACQUIRED TITLE OF MORTGAGOR—PURCHASE-MONEY MORTGAGE.

Where, by a deed to certain described lands, the grantor did not undertake to convey a particular estate but only his "right, title, and interest" therein with a special warranty against the claims and demands of all persons claiming under him and "against none other," and he took back from the grantees a purchase-money mortgage by which the mortgagors undertook to convey title in fee simple, with a full covenant of warranty against the claims of all persons whatsoever, an outstanding interest in the land, not derived through the mortgage, subsequently acquired by the mortgagors, inured to the benefit of the mortgagee under the covenant in his mortgage.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 285–289; Dec. Dig. § 144.*]

5. MORTGAGES (§ 144*)—RIGHTS AND LIABILITIES OF PARTIES.

An agreement by a mortgagee to waive the agreement of the mortgagors made by their covenant of warranty construed, and held to relieve them from any obligation to acquire any outstanding interest for the

benefit of the mortgagee but not to entitle them to acquire such interest to be asserted against the mortgage.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 285–289; Dec. Dig. § 144.*]

At Law. Action by Charles G. Saunders against the Publishers' Paper Company and the Conway Company. Judgment for plaintiff.

Niles & Upton, of Concord, N. H., for plaintiff.
Clarke C. Fitts, of Brattleboro, Vt., for defendants.

BINGHAM, Circuit Judge. This is an action of trespass quare clausum fregit. The writ is dated December 3, 1908. The question involved is the title to a strip of land situated in Grafton county, N. H., which sheds its waters into the Swift river, a tributary of the Saco. It is bounded on the south by the north line of Waterville, on the east by the west line of Albany, on the north by a line running due west from a tree known in the case as the "hemlock corner" and now recognized as the jurisdictional northwest corner of Albany, and on the west by the height of land that sheds its waters into the Swift river.

[1] One source of title on which the plaintiff relies is a grant made in 1830 by the state to Jasper Elkins and his five associates. The plaintiff's contention with reference to this grant is that it extends to the north line of Waterville for its southern boundary and therefore includes the territory here in question. The defendants deny this and say that the southern boundary of the grant is a line running due west from the hemlock tree. A solution of the problem necessitates a construction of the deed and the resolution authorizing the grant. Their construction, like that of any written instrument, is the ascertainment of the intention of the parties, as expressed in the writings, and in the process of construction it is the province and duty of the court to place itself as nearly as possible in the situation in which the parties were at the time the writings were made, so that it may see the application of the language employed to the subject-matter about which the parties were dealing. Weed v. Woods, 71 N. H. 581, 583, 53 Atl. 1024. If, when this is done, the intention of the parties can be ascertained, the court should proceed and declare it; and parol or extraneous evidence of intention would not be admissible; but if, in attempting to apply the language to the subject-matter, an ambiguity should arise (that is, if two situations should be presented, either one of which would answer the terms of the writings with equal certainty), then parol evidence would be admissible to prove which of the two situations the parties had in mind. Clough v. Bowman, 15 N. H. 504; Drew v. Drew, 28 N. H. 489, 494; Heywood v. Lumber Co., 70 N. H. 24, 31, 47 S. W. 294; Kendall v. Green, 67 N. H. 557, 561, 42 Atl. 178; Corwin v. Hood, 58 N. H. 401.

[2] Let us see what the situation was that surrounded the parties at the time they entered into this transaction. It appears that in 1829 the state owned a tract of land lying north of the Gillis and Foss grant, now the town of Waterville, and that Jasper Elkins and his five as-

sociates petitioned the Legislature requesting that the land be granted
to them, which they described as follows:

"Beginning at the southeast corner of land granted to Hatch and Cleaves,
thence on the east and north lines of said land to the east line of Thornton
Gore, thence to the northeast corner of Lincoln, thence east 10 miles, thence
south to the north line of land granted to Gillis and Foss, thence on said
line to the first-mentioned bound."

At the same session of the Legislature a resolution was adopted au-
thorizing a grant to the petitioners of all the state's right and title to
the land, describing it in the same terms as were employed in the peti-
tion. It does not appear that any deed was issued under this resolu-
tion, but in 1830 the Legislature passed a second resolution in favor of
the same grantees, and it is found that this was probably done to recti-
fy the 10-mile course in the resolution of 1829, which was found to
extend into Hart's location.

In the resolution of 1830 the description starts at the northeast
corner of Lincoln and runs east on the north line in which the defect
was in the resolution of 1829 and defines the limits of the grant as fol-
lows:

"Beginning at the northeast corner of the town of Lincoln and running east
7 miles and 117 rods to Hart's location, thence southerly by the western
boundary of said location to a point so far south that a line drawn thence
due south shall strike the northwest corner of the town of Burton, thence
south to said northwest corner of Burton, thence westerly along the northern
line of Waterville to the eastern boundary of Hatch and Cleaves grant, thence
northerly and westerly by said grant to the east line of Thornton, thence by
said line of Thornton northerly to the line of Lincoln and along that line to
the point first mentioned."

The deed to Elkins and his associates follows the language of the
resolution of 1830 in its description of the property.

Waterville was incorporated as a town in 1829 and embraced the
same territory that was granted by the state to Gillis and Foss in 1818.
It is the north line of this town that is referred to as the south bound
of the grant in the deed to Elkins and his associates. In the charter of
Waterville this north line is described as beginning at a "spruce tree
marked" and situated 418 chains north of the "S. & B." corner on Bur-
ton's west line, "thence west 790 chains 50 links to the northeast cor-
ner of a piece of land granted by the state of New Hampshire to John
Raymond, which corner is on the southerly line of a piece of land
granted by said state to Hatch and Cleaves."

In 1815 South Raymond was granted. Its north line is described as
being "on said south line of the Hatch and Cleaves grant."

It will be recalled that in the petition of Elkins and his associates
to the Legislature in 1829, which is apparently the basis of the grant
of 1830, the north line of the Gillis and Foss grant, or Waterville, is
described as striking the Hatch and Cleaves grant at its southeast
corner. It is thus apparent, when the language of the deed of 1830
to Elkins and his associates is read in connection with these records,
which were kept in the possession of the state, that the state intended
to bound its grant on the south by the north line of Waterville, a line
coincident with the south line of Hatch and Cleaves grant and striking

that grant at its southeast corner bound, and that the southeast corner of the Hatch and Cleaves grant should be the southwest corner of the grant to Elkins.

In 1830 the hemlock corner, above spoken of, was in existence and was marked as the northwest corner of Burton. It was situated about a mile north of the northeast corner of Waterville, as called for by its charter. A plan introduced in the case shows that this corner of Waterville is situated a short distance north of where the Swift river crosses the north and south division line between Burton and Waterville.

Burton was granted in 1766. It is matter of general history in New Hampshire that in 1803 the Legislature, with a view to making a map of the state, enacted a law making it the duty of the several towns within the state to cause an accurate survey of the same to be made and transmit a map thereof to the Secretary of State, containing the exact limits of said towns by careful admeasurement, together with a description of all public roads passing through the same, also the rivers, falls and principal streams, ponds, lakes, and mountains, and the names of adjoining towns, with the extent said towns adjoin on their own towns; the whole to be protracted by a scale of 200 rods to the inch and all disputed lines distinctly marked; and that in 1818 such a map was published by the state.

It is in evidence that in 1808 the town of Burton, now Albany, complied with the law of 1803, through its selectmen, who returned to the Secretary of State a map of that town. From this map it appears that the charter northwest corner of Burton, as located by this survey, is also situated a short distance north of where the Swift river crosses the division line between Burton and Waterville and, according to the measurements made and preserved, is 5 miles and 20 rods north of the "S. & B." corner. It is thus seen that the charter northwest corner of Burton, as located by that town in 1808, under legislative authority, is in substantially the same place as the charter northeast corner of Waterville and may have been in fact located at the same place, the variance in the distance from the "S. & B." corner in the two surveys being due to a difference of allowance in chaining; but, according to the measurements preserved, it is located a few rods south of the northeast corner of Waterville.

As to the hemlock corner, there was no evidence that would justify a finding that it had been established under legislative authority as the jurisdictional northwest corner of Burton prior to the grant to Elkins and his associates in 1830 and probably not before 1850. The record evidence preserved in the archives of the state discloses that in 1830, and only 15 days prior to the adoption of the resolution authorizing the grant to Elkins, an application was made to the Legislature by the selectmen of Burton to establish that corner as the northwest corner of the town, and that a remonstrance was also presented in which it was stated that the remonstrants had learned with regret that a petition was to be presented to the Legislature "praying that the northerly line of the town of Burton may be established farther north than it now is, and in such a place as greatly to discommode all those

who live northerly of said line," and praying "that the northerly line of Burton may be extended no farther north." In the House the petition and remonstrance were referred to the committee on towns and parishes, which, after considering the matter, reported a resolution giving the parties leave to withdraw. This resolution was adopted and was for all practical purposes a refusal on the part of the state to rec· ognize the hemlock corner as the northwest jurisdictional bound of the town.

The language of the Elkins deed is plainly framed upon the idea that the southwest corner of the grant is where the north line of Waterville strikes the Hatch and Cleaves grant; that its south line is the north line of Waterville; and that the southeast corner of the grant is where the north line of Waterville terminates at its easterly end. This will be readily seen if we reverse the courses in the deed. Reversing the courses, the description will read:

"Beginning at the northeast corner of Lincoln, thence southerly by the east line of Lincoln, and the east line of Thornton to the Hatch and Cleaves grant, thence easterly and southerly by said grant to the north line of Waterville, thence easterly along the north line of Waterville to the northwest corner of Burton."

Now the hemlock corner does not answer the call of the deed for the southeast corner of the grant, as it is not located at the easterly end of the north line of Waterville but a mile above it. A line running on a due west course from it, or on any other course, would not be the north bound of Waterville, as the deed requires, and would not coincide with the south line of the Hatch and Cleaves grant, as the north line of Waterville does and the south line of Elkins grant should. The introduction of that corner, as the southeast corner of the grant, and of a line running due west therefrom as its south line, would necessitate a rejection of the Waterville north line from the description in the deed and a substitution of a new line and a new southwest corner about a mile north of the southwest corner called for in the deed. Therefore it seems to me that the reasonable inference to be deduced from the language of the deed is that the parties intended, when they inserted the northwest corner of Burton in the description, the charter northwest corner of Burton as called for by the survey of 1808, and that they understood that that corner was situated at the easterly terminus of the north line of Waterville. If the charter corner of Burton is situated at that point, the description in the deed is complete.

If, however, the charter corner of Burton is located some 30 rods south of the easterly terminus of the Waterville line, it does not follow that the parties had in mind the hemlock corner as the southeast corner of the grant, for such a conclusion would be inconsistent with the language of the deed taken as a whole and would involve a rejection of known bounds fully answering the description in the deed. Under such circumstances, effect will be given to the intention of the parties by rejecting the charter northwest corner of Burton, if it is located south of the northeast corner of Waterville, and terminating the grant at the northeast corner of that town (Weed v. Woods, 71

N. H. 581, 53 Atl. 1024; Morse v. Rogers, 118 Mass. 572, 578; Parks v. Loomis, 6 Gray [Mass.] 467), for the grantees, in their application to the Legislature, limited their request to land north of Waterville, and the state manifestly did not intend to grant land south of that line that it did not own but had previously conveyed.

Again I am of the opinion, if the hemlock corner was intended as a bound of the grant, that the language of the deed taken as a whole discloses that it could not have been intended as the southeast corner of the grant, and, on such an assumption, that there was a plain omission in the description of a line from that bound to the northeast corner of Waterville. The insertion of this line will carry out the intention of the parties and make the description complete.

It is of no importance in this case whether the line going north from the northeast, corner of Waterville to Hart's location is a straight line or passes through the hemlock corner, for all the land here in dispute lies west of a line passing through that corner.

This conclusion renders the finding of the referee that the parties intended the hemlock corner as the southeast corner of the grant, and a line running west therefrom as its south line, immaterial, as the case does not present a situation calling for the introduction of parol evidence on the question of intention.

[3] The defendants make the further contention that, if the description in the deed of the state to Elkins and his associates embraced the territory in question, the plaintiff is precluded from setting it up as against them because of the decree in the suit of the Winnipiseogee Paper Company against James and the New Hampshire Land Company, and because of his having participated as counsel for the defendants in that suit.

That suit was a writ of entry to recover possession of the territory here in question and also of territory lying west of it and extending to the Hatch and Cleaves grant. The Winnipiseogee Paper Company claimed title under a grant from the state to Samuel Allen in 1839 and also under deeds from Jacob Sargent and Ebenezer P. Elkins, two of the grantees in the Elkins deed. It appeared that in 1836 Jacob Sargent and Ebenezer P. Elkins deeded to Stephen Thayer territory claimed to be located south of a line drawn west from the hemlock corner; and that Thayer conveyed his interest in the same to Allen in 1838, who in 1839 obtained the deed from the state. This deed contained the following description:

"Do remise, release, and forever quitclaim unto Samuel Allen of Grafton, county of Worcester, * * * and others claiming under Stephen Thayer, their heirs and assigns forever, all the right, title, and interest of the state of New Hampshire in and unto a certain strip of land lying between Elkins grant, so called, and the north line of Waterville, in the county of Grafton, in said state, 2,700 rods in length and 273 rods in width: Provided the said land has not been granted to other individuals before the date of deeds from Jasper Elkins and his associates to said Thayer."

The defendants in the Winnipiseogee suit claimed title under the grant from the state to Elkins and his associates. The action was brought in September, 1888. At that time Charles G. Saunders, as trustee for the Saunders family, held a warranty mortgage, given

October 15, 1887, by the New Hampshire Land Company and George B. James, covering the land then in question, and other valuable lands located in various towns in the state. The decision was in favor of the Winnipiseogee Paper Company, sustaining the Allen's grant title, and James and the Land Company appealed. Pending the appeal **a** settlement took place in which the Winnipiseogee Paper Company conveyed the east and west ends of the then disputed territory to James and the Land Company, retaining the central portion or that section drained by the Mad river.

It is found that the Winnipiseogee Paper Company did not change its position in reliance upon anything that Charles G. Saunders did while acting as associate counsel for James and the Land Company, and the conclusion of the referee that there was no estoppel in pais is undoubtedly correct. It is, however, a conclusion of law and not of fact.

Neither is the plaintiff estopped by the judgment in that suit from taking the position that Elkins' grant extends to the north line of Waterville. He was not a party of record in that proceeding, and, having obtained his mortgage prior to the bringing of the suit, he is not bound as a purchaser pendente lite or as privy in estate with the mortgagors. As between him and the mortgagors, he was the real owner of the property; the foreclosure operated simply as a bar to their right of redemption. Parker v. Moore, 59 N. H. 457; Hunt v. Haven, 52 N. H. 162, 170; Orr v. Hadley, 36 N. H. 575; Keokuk & Western Railroad Co. v. Missouri, 152 U. S. 301, 14 Sup. Ct. 592, 38 L. Ed. 450.

[4] The defendants also take the position that even if the description in the Elkins deed of 1830 carried the grant to the north line of Waterville, and no territory is left on which the deed from the state to Allen can operate, still the plaintiff cannot maintain this action against them as they are tenants in common with him by virtue of the Stephen Thayer title which they claim to own.

In answer to this various propositions are advanced by the plaintiff, one of which is that, if Stephen Thayer ever had any title to or interest in the land in controversy, it was acquired by the New Hampshire Land Company and James in their settlement with the Winnipiseogee Paper Company in 1895 and inured to the plaintiff under the covenant of warranty contained in a mortgage given him in 1887 by the New Hampshire Land Company and James and which covered the territory in dispute.

In 1877 Daniel Saunders, who in 1864 acquired the title to Elkins grant, except so far as there may have been an outstanding interest in Stephen Thayer, sold and conveyed and forever remised and released unto Charles G. Saunders, as trustee for the Grafton County Lumber Company—

"the following described tract of land situated in the town of Livermore, county of Grafton, state of New Hampshire, and bounded and described as follows, to wit: 'Beginning at the northwest corner thereof at the southeast corner of the town of Franconia and the northeast corner of the town of Lincoln, thence running east to the west boundary of Hart's location, so called, thence southerly by the western boundary of Hart's location to a point nearest the northwest corner of the town of Albany, thence in a straight line to the northwest corner of said Albany, thence southerly by the west bound-

ary of said town of Albany to the northeast corner of the town of Waterville as said town was originally chartered by said state of New Hampshire, thence westerly by the northerly boundary of said town of Waterville as originally chartered to the easterly boundary of Hatch and Cleaves grant, so called, thence northerly by the eastern boundary and westerly by the northern boundary of said Hatch and Cleaves grant to the eastern boundary of the town of Thornton, thence northerly by the eastern boundary of said Thornton and also northerly by the eastern boundary of the town of Lincoln to the point of beginning.' "

This deed contained the following covenant:

"And I, the said Daniel Saunders, for myself and my executors and administrators, do covenant with the said Charles G. Saunders, his heirs and assigns, that the premises are free from all incumbrances made or suffered by me, with the exception of a certain mortgage made by me to one Nathaniel H. Weeks, and also with the exception of a lease of a part of the premises made to the firm of C. W. Saunders & Co., and that I will, and my heirs, executors and administrators shall warrant and defend the same to the said Charles G. Saunders, his heirs and assigns, against the lawful claims and demands of all persons claiming by, through or under me."

October 1, 1887, Charles G. Saunders, trustee for the Grafton County Lumber Company, conveyed the west portion of Elkins grant, by a description extending to the Waterville line, to John Tatterson, who conveyed the same to James and the New Hampshire Land Company, who in turn mortgaged it back to Tatterson.

October 15, 1887, Charles G. Saunders, trustee for the Grafton County Lumber Company, remised and released to George B. James and the New Hampshire Company all his—

"right, title, and interest in and to that part of Elkins grant, so called, * * * which is drained by the Saco river and its tributaries, and bounded as follows, to wit: 'Beginning at the northeast corner thereof at a point on the west line of Hart's location so called, thence running westerly by the south line of Sargent and Elkins grant, so called, to that part of Elkins grant which was conveyed by me to John Tatterson by deed dated October 1, A. D. 1887, thence running southerly by that part of said grant so conveyed to said Tatterson to the north line of the town of Waterville, thence on the north line of said town (as said line is indicated by the original charter of said town of Waterville) to the west line of the town of Albany, thence northerly by said west line to the northwest corner of said Albany, thence northeasterly by the shortest line from said corner to Hart's location, thence northerly to the point of beginning by the west line of said Hart's location according to the grant thereof made to Thomas Chadbourne A. D. 1772 as said west line is shown on a plan of said location made by Timothy Walker A. D. 1772.' "

This deed contained a covenant in which the grantor agreed to warrant and defend the premises "against the lawful claims and demands of all persons claiming under me * * * and against none other."

October 15, 1887, James and the New Hampshire Company mortgaged to Charles G. Saunders, trustee, the whole of Elkins grant and several other valuable tracts of land, in which mortgage the grant was described in substantially the same terms as in the above deed of Daniel Saunders in 1877 and as extending to the charter north line of Waterville. It contained the following covenants:

"And we, the said grantors, for ourselves and our heirs, executors, administrators and successors, do jointly and severally covenant with the said grantee, his heirs and assigns, that we are lawfully seized in fee simple of the

granted premises; and that they are free from all incumbrances except a mortgage of $6.000 upon a portion of said premises given by Daniel Saunders to the Belknap Savings Bank, and also another mortgage on a portion of said premises given by the said grantors to John Tatterson by deed bearing date the 1st day of October, A. D. 1887, both of which mortgages said grantors assume and agree to pay; that we have good right to sell and convey the same to the said grantee, his heirs and assigns forever, as aforesaid; and that we will, and our heirs, executors, administrators and successors shall warrant and defend the same to the grantee and his heirs and assigns forever against the lawful claims and demands of all persons."

This mortgage was conditioned upon the payment of notes for $90,-000 and also upon the performance of a complex and important contract between the parties relating to lumbering operations.

August 6, 1890, Charles G. Saunders made a peaceable entry into the east portion of Elkins grant (being that territory described in his deed of October 15, 1887, to George B. James and the New Hampshire Land Company) in the presence of two witnesses, for the purpose of foreclosing his mortgage on that portion of the grant, and duly published and recorded a notice of his entry as required by the laws of the state of New Hampshire. In that proceeding foreclosure would have become absolute on the 6th day of August, 1891, but for a temporary injunction staying the proceeding, which the mortgagors procured August 3, 1891. The injunction proceeding was dismissed in 1896 at the November term of court for Grafton county, and the foreclosure became absolute.

May 28, 1895, the same day on which James and the New Hampshire Land Company had their settlement with the Winnipiseogee Paper Company and obtained from the latter a deed of all their title to the eastern and western ends of Allen's grant which embraced the Stephen Thayer title to those lands, James and the New Hampshire Land Company entered into an agreement with Charles G. Saunders (the exhibit shows that it was with him as an individual and not as trustee) containing the following stipulations:

"The said James and the N. H. Land Co. are to convey or cause to be conveyed to said Saunders by good and sufficient deed conveying title thereto that portion of land situate in Livermore, New Hampshire, which lies between a line run by George T. Crawford as the north line of Waterville, and a line drawn west from the northwest corner of Albany, to the height of land dividing the waters which flow into the waters of the Saco and Pemigewasset rivers, respectively, the east boundary of said tract being the west line of the town of Albany.

"The said James and the N. H. Land Co. agree to indemnify and save harmless the said Saunders from any claim of trespass, or for stumpage for trees cut by him on lands in Allen's grant, so called, or in the town of Waterville.

"The said James and the N. H. Land Co. agree that they will cause the action commenced by them against the said Saunders and Daniel Saunders in reference to foreclosure and settlement of accounts, now pending in the Supreme Court within and for the county of Grafton, and state of New Hampshire, to be dismissed.

"The said James and the N. H. Land Co. agree to procure from the Winnipiseogee Paper Co. an agreement * * * that said paper company will make no claim that the north line of Waterville extends north of the aforesaid line run by said Crawford as the north line of Waterville.

"In consideration of the above agreements on the part of said James and the N. H. Land Co. * * * the said Saunders agrees that the notes for

208 F.—29

$90,000 secured by mortgage to said Saunders, made by the said James and the N. H. Land Co., shall no longer be a personal claim upon said James and the N. H. Land Co., or on either of them, and that neither shall be called upon personally to pay the same, or any part thereof, and that said Saunders will look to his foreclosure of said mortgage upon the lands mentioned in said mortgage which are drained by the Saco river and its tributaries, for the payment of that part of said notes which have not already been paid.

"The said Saunders also agrees to waive the agreements which the said James for himself or in behalf of the N. H. Land Co. has made concerning the covenants of warranty in certain mortgages made by him and the N. H. Land Co. in relation to lands in any part of Elkins grant, so called, but this waiver is not to allow the said James and the N. H. Land Co., or either of them, or any one in their behalf, to acquire any disputed title in said Elkins grant, so as to hold the same against the said Saunders or his assigns.

"The performance of the terms of this agreement on the part of said James and the N. H. Land Co. is to be a condition precedent to the performance of the same on the part of said Saunders."

On May 28, 1895, the Winnipiseogee Paper Company having conveyed to James and the New Hampshire Land Company the territory in dispute in this suit, James and the land company conveyed to Charles G. Saunders the same territory by a quitclaim deed, in which the grantee was not described as trustee, containing a covenant agreeing to "warrant and defend the said premises to him (the said Charles G. Saunders), his heirs and assigns, against the lawful claims and demands of any person or persons claiming by, from, or under us, but against no other."

This deed the grantee failed to record until March 9, 1907.

April 1, 1902, George B. James "remised, released, and quitclaimed" to the White Mountain Paper Company certain tracts of land, including "all that part of said grant (Allen's grant) at the easterly end which is drained by the Saco river and its tributaries." February 10, 1902, the New Hampshire Land Company "remised, released, and forever quitclaimed" to Samuel A. Merrill certain described real estate, including the following:

"Also such part of Allen grant as lies west of the height of land in the Mad river valley, and such part of said grant as is drained by the brooks running into the town of Thornton, being all and the same lands conveyed by the said Winnipiseogee Paper Company to said George B. James and the New Hampshire Land Company by deed dated May 28, 1895, and recorded in said Registry Book 423, p. 377."

It is through these deeds of James to the White Mountain Paper Company and of the New Hampshire Land Company to Merrill that the defendants derive whatever title they have to the land in question.

The defendants' position is that the Stephen Thayer title acquired by James and the New Hampshire Land Company May 28, 1895, did not inure to the benefit of the plaintiff under the covenant of warranty in the mortgage of October 15, 1887, and that James and the land company would not be, and that the defendants claiming under them are not, estopped from setting up this title. They concede that, as a general principle of law, a mortgagor is bound by the covenant of warranty in a mortgage the same as in an absolute deed but contend (1) that Charles G. Saunders received the mortgage in the same capacity (that of trustee for the Grafton County Lumber Company)

that he made the conveyance to James and the land company; (2) that the mortgage was given to secure the purchase money; and (3) that, the mortgage being given to secure the purchase money, the covenant of warranty would not estop the mortgagors from setting up a subsequently acquired title as against the mortgagee.

The referee, however, has found that the capacity in which the mortgagee received the mortgage was as trustee for the Saunders family and not as trustee for the Grafton County Lumber Company, which was the capacity in which he made the deed to James and the land company. If this finding is correct, it would seem that the mortgage was not a purchase-money mortgage in the strict sense, and that a novation must have taken place whereby the right to the balance of the purchase price was transferred from Saunders, trustee for the Grafton County Lumber Company, to Saunders, trustee for the Saunders family, and the mortgagors' obligation to Saunders, trustee for the Grafton County Lumber Company, was discharged. But in this discussion we will assume that the mortgage was in fact a purchase-money mortgage given to Saunders as trustee for the Grafton County Lumber Company. Such an assumption being made, does it follow, when the terms of the deed and mortgage are considered, that the mortgagors would not be estopped by their covenant of warranty from setting up the subsequently acquired Thayer title? It seems to me that it does not, and that the authorities cited by the defendants, instead of supporting their contention, as applied to the terms of this deed and mortgage, support the position of the plaintiff. It is to be noted that, in the deed from Saunders, trustee for the Grafton County Lumber Company, to James and the Land Company, the grantor (mortgagee) does not undertake to convey to the grantees (mortgagors) a particular estate but merely the right, title, and interest of the grantor in and to the land described, and that the covenant is limited to defending the conveyance only as against previous conveyances or incumbrances made or suffered by the grantor. Loomis v. Bedel, 11 N. H. 74; Bell v. Twilight, 26 N. H. 401. On the other hand, in the mortgage the mortgagors undertake to convey to the mortgagee an estate in fee simple. By that deed they did "give, grant, bargain, sell, alien, enfeoff, convey, and confirm" unto the mortgagee a particular estate in the lands described. And in addition to this the mortgage contains a covenant of warranty by which the mortgagors not only covenant to warrant and defend the title against previous conveyances or incumbrances made or suffered by them but against any and all outstanding titles, however created.

As it appears that the mortgagee did not undertake by his deed to convey a particular estate, and as there is no claim that he ever owned the Stephen Thayer title or made a conveyance of any interest in the property, prior to the conveyance to the mortgagors, he clearly cannot be said to have broken the covenant in his deed or to be in any way in default to the mortgagors with reference to the transaction. But the mortgagors, having undertaken to convey an estate in fee simple and covenanted to warrant and defend it against all claims and demands, were clearly in default to the mortgagee, and, when they obtained the

outstanding Thayer title, every reason existed why it should inure to the mortgagee under the covenant.

In Randall v. Lower, 98 Ind. 255, upon which the defendants chiefly rely in support of their contention, the mortgagee by his deed had undertaken to convey to the mortgagor an estate in fee simple in the land described, and the mortgagor in his purchase-money mortgage had undertaken to reconvey the same estate. Both conveyances contained full covenants of warranty. The mortgagee did not have the title which he assumed to convey, and, the mortgagor having purchased in an outstanding title, the question was whether it inured to the mortgagee under the mortgagor's covenant. In that case both deeds undertook to convey a particular estate in fee simple. The covenants which they contained were the same and were agreements to warrant and defend against all outstanding titles. On its face it was a case of covenant against covenant, and the facts disclosed that the situation was such it would be inequitable to permit the mortgagee to avail himself of the mortgagor's covenant as an estoppel, for, although the mortgagor's covenant was broken, the covenant of the mortgagee in his deed was likewise broken, and besides this he was the party first in the wrong. The gist of the opinion is contained in these words, where the court said:

"The mortgage was made upon the faith of the representation contained in the deed of the mortgagee, and he cannot reap any benefit from covenants, which his own representations justified the mortgagor in making, by extending the covenants to an estate derived from another source. It is not consistent with good conscience for a grantor to grasp after-acquired property where he himself assumed to vest all the title which his mortgagor undertook to grant back to him by way of mortgage to secure the purchase money."

And it was held that the after-acquired title did not inure to the mortgagee.

In this case, however, the facts are different from those, for here the mortgagee did not undertake to convey a particular estate or covenant to defend against any outstanding title other than such as he might himself have previously created, and he had created none. The mortgagors, therefore, could not have been misled into making a conveyance in fee simple with full covenants of warranty upon the faith of any representation that the mortgagee had made in his deed; and, such being the fact, there is no reason why they should not be holden to fulfill their covenant. The following cases cited by the defendants are to the same effect: Brown v. Staples, 28 Me. 497, 48 Am. Dec. 504; Hardy v. Nelson, 27 Me. 525; Smith v. Cannell, 32 Me. 123; Sumner v. Barnard, 12 Metc. (Mass.) 461; Brown v. Phillips, 40 Mich. 264; Haynes v. Stevens, 11 N. H. 33.

The defendants also contend (1) that the mortgage was discharged, and (2) that the covenant of warranty which it contained was waived, by the agreement of May 28, 1895, and hence the Thayer title did not inure to the plaintiff.

The first claim is based upon that part of the agreement of May 28, 1895, which provides that the notes for $90,000 secured in the plaintiff's mortgage should no longer be a personal claim upon James and the Land Company, and that he should look to the foreclosure of his

mortgage upon the lands which were drained by the Saco river and its tributaries for the payment of the notes that remain unpaid. This agreement did not contemplate a discharge of the mortgage upon that portion of the land upon which the plaintiff had entered for the purpose of foreclosure and was not a discharge of the mortgage as to that land. It was rather an affirmance of the existence of the mortgage and an agreement that, upon the foreclosure becoming absolute, the value of the land should be considered sufficient to satisfy the mortgage debt, and that the plaintiff should not be entitled to claim otherwise. Fletcher v. Chamberlin, 61 N. H. 445.

[5] The second claim is based upon that part of the agreement of May 28, 1895, in which Saunders "agrees to waive agreements which the said James, for himself or in behalf of the New Hampshire Land Company, has made concerning the covenants of warranty in certain mortgages made by him and the New Hampshire Land Company in relation to lands in any part of Elkins grant," etc.

If, by this agreement, it was intended to waive the covenant of warranty which we are considering, and the term "Elkins grant" was employed in the contract to define that portion of the land described in the mortgage that lay north of a line running due west from the hemlock corner, the covenant as to the strip of land that lay south of that corner and described in the mortgage was in no way affected or waived.

Again, if it was intended by that description to include land south to the Waterville line, the waiver was not absolute, for it was expressly agreed that it should not permit the mortgagors to purchase outstanding titles and hold them as against the plaintiff. In other words, the fair meaning of the contract is that the waiver should relieve the mortgagors from purchasing outstanding titles, except that held by the Winnipiseogee Company, which they had agreed to purchase, and, with this exception, should relieve them from liability for damages for failure of title; but that if they purchased in any outstanding titles the covenant was not to be considered as waived as to such titles.

Another answer to the defendants' contention is that the waiver of the covenant of warranty, like all the stipulations entered into by Saunders in this agreement, was expressly conditioned upon the performance of the obligations assumed by James and the New Hampshire Land Company, one of which was that they should procure a dismissal of their proceeding in equity against Saunders. This they did not do until some time in 1896, with the result that the waiver did not become operative until that time. Such being the case, the covenant of warranty in the mortgage was in full force on May 25, 1895, when James and the New Hampshire Land Company acquired the Stephen Thayer title, and it inured to the mortgagee under the covenant.

Furthermore, if the deed to Allen in 1839 conveyed a valid title, and the deed of 1830 to Elkins and his associates did not extend to the Waterville line, I am of the opinion that, when James and the New Hampshire Land Company acquired the Allen's grant title in 1895 to the extent that that title embraced the territory here in question, it

inured to the plaintiff under the covenant of warranty in his mortgage the same as the Thayer title did.

I pass by the question whether the plaintiff's failure to record the quitclaim deed from James and the Land Company of May 28, 1895, precluded him from setting up that deed as against the defendants, and the question whether the facts found as to notice were such as to do away with the necessity of recording the quitclaim deed, as both questions seem to me immaterial in view of the conclusions reached on the other branches of the case.

It appeared in evidence that, when Charles G. Saunders changed the character of his trusteeship from that of trustee for the Grafton County Lumber Company to that of trustee for the Saunders family, he executed a written declaration of trust, and that some time before 1902 this declaration was lost, and although a search had been made it could not be found. Saunders was then permitted to testify, subject to the defendants' exception, as to the contents of the lost declaration, and in doing so said that it covered the same lands, was in favor of the same parties, and was upon the same terms as those set out in a declaration of trust made by him in 1902, confirmatory of that of 1887. This declaration was then introduced and read in evidence. The regular method no doubt would have been for the witness to have testified from memory as to the contents of the instrument of 1887, without reference to that of 1902, but I am of the opinion that this was in substance what took place, and that the defendants were in no way prejudiced by the course pursued. This testimony was of no consequence, except as showing who were the beneficiaries under the trust in which Mr. Saunders held the mortgage of October 15, 1887, and as to which he had already testified that he held it for the benefit of himself and his three sisters. This disposes of defendants' second exception.

As to defendants' twenty-fifth exception, it may be said that the question whether on the facts found there was an estoppel in pais involved a conclusion of law and not of fact, and that the referee so regarded it, for his finding that there was no estoppel in pais was conditional upon its being a question of fact and not of law. The important finding on this question was that the Winnipiseogee Paper Company did not change its position "in respect to the course of their proceeding by reason of Saunders being in the case as counsel." This fact being found, it followed as a matter of law, so far as this question was concerned, that there was no estoppel in pais.

I see no occasion for questioning the finding of the referee that Saunders did not intend to submit his claim for decision in the case of the Winnipiseogee Paper Company against James and the New Hampshire Land Company. It seems to be abundantly supported by the evidence.

I have examined all the other exceptions upon which the defendants rely and find nothing in them calling for extended consideration. They all relate to findings, or the introduction of evidence, on questions which in no way enter into this decision and which could in no way have prejudiced the rights of the defendants.

It follows, therefore, from the foregoing conclusions and findings, that the plaintiff is entitled to maintain his action, and that the case should proceed to trial upon the question of damages.